**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x

**Sallem Ahmed,**
**Plaintiff,** **COMPLAINT ANDJURY DEMAND**

vs.

**Fun.xyz and The Fun Group Inc.,**

Defendants.

-------------------------------------------------------------x

**NATURE OF THE ACTION**

Sallem Ahmed, an observant Muslim Arab man, was hired as a Senior Software Engineer for a financial tech start-up, The Fun Group Inc./Fun.xyz ("Fun"). The hiring process was altered for Ahmed to have him interview Head of operations at the end of his interview process as opposed to first and ask questions about how Ahmed would cater to jewish employees. Fun, through its young co-founders Alex Fine and William Starr, created policies solely for Ahmed and did not apply these policies to other non-Muslim, Arab employees. Fun told Ahmed that there was a "no politics" policy that extended to his LinkedIn but allowed others outside his protected class to associate their LinkedIn with politics. Fun instructed Ahmed not to discuss politics at work, but all non-Muslim,Arabs did, including the co-founders. Fun directed Ahmed not to wear political and traditional Arab garb but allowed others outside his protected class to wear political garb and post flags on their Slack profile. No other employees even knew about the "no politics" policy and no one but Ahmed was required to adhere to it. Ahmed was only notified about the "no politics" policy via telegram text message between him and Fine. When Ahmed complained repeatedly about the differential treatment, Fun did not investigate and was dismissive.

Although Ahmed told Fun prior to starting his employment that he would be traveling to Mecca, Fun issued a new PTO Policy days before his departure. Fun also disrupted his once-in-a-lifetime holy journey with work demands. Upon his return from Saudi Arabia, Fun demanded that Ahmed withdraw his discrimination complaints by agreeing to yet another new policy created for him, which required that he assume the best intentions for everyone. Objecting to infringement of his right to engage in protected activity, Ahmed refused to withdraw his complaints of discrimination and was terminated. After Ahmed was fired, Fun's General Counsel sent a letter providing a new reason for his termination and the results of Fun's after-the-fact investigation of Ahmed's discrimination complaints.

**JURISDICTION**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 for civil actions arising under the laws of the United States and supplemental jurisdiction.

2. Plaintiff has satisfied all administrative prerequisites by dual filing a charge with the New York State Division on Human Rights and New York City Commission on Human Rights and received an administrative convenience dismissal to file his claims in court via email notification on July 24, 2026.

**VENUE**

3. Venue is proper in this district under 28 U.S.C. § 1391(b) because Fun is a business corporation which operates and is licensed to operate in this District and because a substantial part of the events giving rise to the claims took place in this District.

**THE PARTIES**

4. Plaintiff Sallem Ahmed ("Ahmed " or "Plaintiff") is an Arab, Muslim man who worked in New York City and lives in Bayonne, New Jersey.

5. Ahmed was, at all times relevant, an "employee" within the meaning of 42 U.S.C. § 1981, the New York State Human Rights Law, NY Exec L § 296 et seq. and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq.

6. Defendants Fun.xyz and The Fun Group Inc. (hereinafter, collectively "Fun") are domestic business corporations licensed to do business in New York and headquartered at 200 Park Ave South, Suite 1305, New York, N.Y. 10003.

7. Defendants were, at all times relevant, Plaintiff's "employer" within the meaning of 42 U.S.C. § 1981, the New York State Human Rights Law, NY Exec L § 296 et seq. and the New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq. and have an employment relationship with the requisite number of employees to trigger coverage under each of the statutes.

**FACTUAL BACKGROUND**

**Ahmed Provides Niche Skills in Frontend Software Engineering for Crypto**

8. Fun is a financial tech start-up crypto checkout payment platform that was co-founded by Alex Fine ("Fine"), the Chief Executive Officer, and William Starr ("Starr"), the Chief Technology Officer.

9. Ahmed received a degree in structural civil engineering from the City College of New York and worked as a construction manager for the largest general contracting company in the United States, Turner Construction. For nearly ten years, Ahmed has been a software developer at prestigious companies including Google and has developed a specialty in frontend software engineering in the cryptographic space. After Google, Ahmed worked at Aptos Labs, a Layer 1 blockchain, and distinguished himself by winning the Aptos Labs 2023 hackathon.

10. Ahmed is a devout Egyptian Muslim who abides by the Qur'an, Islam's holy book of divine revelations. He observes the Five Pillars of Islam, including faith, prayer, alms, fasting and pilgrimage. Among the tenets of Islam are guidance on conduct that is considered unlawful or "haram," the commission of which would be considered a sin. For example, Ahmed adheres to a religious diet which prescribes which types of meat and fish he may consume. Ahmed also abides by the strict religious rules on modesty; as a married man, Ahmed is prohibited from having physical interaction of any sort with women besides his wife.

**Fun Has a Different Interview Process for Muslim Arabs**

11. In Spring 2024, Ahmed applied for a position at Fun as a Frontend Software Engineer and was interviewed by Fine, Starr and the engineering team as part of the selection process.

12. During the interviews, both Fine and Starr separately asked multiple hypothetical questions about how Ahmed might interact with an Israeli employee and how Ahmed would respond if an employee was emotional at work about Israel as it relates to the war in Gaza. Despite these hypotheticals, the co-founders instructed Ahmed that at Fun there would be no politics allowed at work.

13. During the interview process, Ahmed told Fine that he had already booked a once-in-a-lifetime trip in May to several holy sites in Saudi Arabia, a trip called Hajj that he had secured with some difficulty months earlier. Saudi Arabia awards very few visas and Ahmed had applied without success in the past. Should he be offered the job, Ahmed deferred to Fine as to whether he preferred for him to start right away or after his return from his Hajj.

14. Fine next scheduled an interview of Ahmed with engineer Chloe Tan. Ahmed told Fine in advance of meeting that he does not shake hands with women as per his religion.

15. Ahmed then met with engineer Chloe Tan, both online and then later in the office. During his in-person interview with Chloe, Ahmed advised her that he didn't shake hands with women because of his religion. Later in the conversation Ahmed again advised Fun of his upcoming Hajj.

16. In early May 2024, Fine offered Ahmed the job and insisted that Ahmed start immediately, with full knowledge of the upcoming paid time off for Hajj in late May. Fun had a PTO Policy which granted unlimited paid time off.

17. Just before commencing employment, Fine told Ahmed to remove all previous political posts or likes from his LinkedIn account because of the "no politics" at work policy.

18. Ahmed told Fine that he could not comply because doing so would conflict with his religious obligations as a Muslim. Ahmed specifically identified Qur'an 4:135, which commands believers to stand firmly for justice and bear truthful witness even where doing so is personally costly, as the religious basis for his objection. Despite this express notice of a religious conflict, Fine did not engage in any interactive process to explore a reasonable accommodation and instead required Ahmed to agree not to post or like any new political content as a condition of the "no politics" policy.

19. After signing the contract, Ahmed met on May 8, 2024 with Fine, Starr and Gabriella L. ("Gabby"), the Head of Operations, at a restaurant for an introductory meeting. Ahmed told Gabby upon meeting her that he does not have any physical contact with women. Gabby was supposed to meet with Ahmed in the first interview as she does with all new candidates to introduce Ahmed to the company. However, Ahmed met Gabby for the first time in this meeting after passing the technical interviews and the questions about how Ahmed would cater to Jewish Israeli employees in the company. Before setting up the meeting, Fine told Ahmed that he was referring to Gabby as the Jewish Israeli Employee that he had to cater to her feelings and that should have guessed it was her because she was the last person in the company that he did not meet.

20. Ahmed began work on May 13, 2024 and was the only Arab, Muslim in the office. During onboarding, Ahmed memorialized with Gabby his upcoming PTO for his Hajj, which was to be from Monday, May 27 – Wednesday July 9, 2024, by entering it in the Fun shared calendar.

**<u>Fun's "No Politics" Policy Only Applies to Ahmed</u>**

21. Ahmed was never given a written "no politics" policy and there was nothing about politics in the Fun Employee Handbook. Despite that, he assiduously adhered to the "no politics" policy that Fine had described. However, at work, he observed that no one else was abiding by the "no politics" policy and in fact, no one else at work had ever heard of such a policy.

22. For example, Gabby's LinkedIn profile had multiple "liked" political posts about Israel, including one saying October 7 attackers had "messed with the wrong people" and another political post that was fundraising for the "front-lines," which are armed soldiers engaged in the conflict and the Israeli Defense Force soldiers in the war in Gaza.

23. Chloe Tan ("Tan") and Changze Cui, engineers, told Ahmed that they had never been told about any "no politics" policy by Fun.

24. During one workday, Fine began a conversation about American politics encouraging Ahmed to vote for Donald Trump in the upcoming 2024 elections.

25. On another occasion, Starr discussed international politics including how America initiates international regime change through political manipulation and employs Blackwater, a private military company, for specialized projects instead of using their own military service.

26. On another day, Tan opined about international politics including her theories about the death of the President of Iran, whether it was accidental and which country was to blame. Tan tried to engage Ahmed in the discussion, but he refused, in an effort to comply with the "no politics" policy.

27. Tan later brought up her theories with Gabby and they discussed the topic robustly, disagreeing about who was to blame.

28. On May 17, 2024 Gabby wore a conspicuous necklace to work, shaped like the dog tag worn by the Israeli Defense Forces. The necklace said "October 7" and emblazoned on it was an Israeli flag, a Jewish star and the expression "Together We Will Dance Again." This apparel was upsetting to Ahmed because it was a political message in the workplace, the type of message he was told was in violation of the "no politics" policy. Ahmed felt muzzled because he was not permitted by Fun to make political statements; he felt unfairly silenced about the decades of occupation of Palestine which preceded and followed October 7, 2023. Gabby, who is not a Muslim, Arab, was free to flagrantly make political statements in the workplace despite the "no politics" policy.

29. On May 21, Ahmed reported to Fine these multiple violations of the "no politics"policy and highlighted the differential treatment of Ahmed in Fun's application of the policy. Fine was dismissive, explaining that Gabby had recently visited an Israeli Museum.

30. Ahmed asked if Gabby's behavior meant that he could wear a keffiyah to work; Fine said no. Ahmed asked if Gabby's behavior meant that he could make a post on LinkedIn commemorating Palestinian lives and the suffering of the Palestinian people, including the hostages taken by Israelis; Fine said no. Fine did not agree to investigate Ahmed's complaint of differential treatment.

**Gabby Spitefully Touches Ahmed in Violation of his Religion**

31. One day in the lunch area, despite having been told directly by Ahmed on multiple occasions that he was not permitted by his religion to have any physical contact with women, Gabby intentionally defied his religious and gender boundaries.

32. On that day, Gabby was getting something from the refrigerator and the ice machine began to overflow. Ahmed was in the area and tried to help gather the falling ice and put it in a bag that Gabby was holding. Though Ahmed was careful to keep his hands away from Gabby, she deliberately grabbed the ice straight from Ahmed's hands. She then knowingly wiped her bare hands on his hands with a smirk on her face because she was aware that this act transgressed both his religion and sex.

33. Feeling sexually violated and humiliated, Ahmed looked down and stopped helping with the ice. Ahmed left swiftly to work in another room. Gabby did not apologize then or at any time after.

34. In Islam, modesty is considered a key virtue that reflects one's piety and devotion to God. Islam has strict rules on the interaction with people from the opposite gender. Ahmed made this very clear to all the employees in the company during the interview process and

35. Later that day, Ahmed went home and told his wife of three years what had happened with Gabby. She was very upset and expressed concern about continuing to work with women in the future. Both Ahmed and his wife experienced the touching by Gabby as sexual and religious harassment especially given that he provided ample notice to everyone at work multiple times about his religious beliefs, that it was not an accident, and that Gabby never expressed any remorse.

36. Hajj is a rebirth of purity and the reward is the cleansing of one's sins. As Ahmed was also preparing for his Hajj, he was frustrated to now be carrying more sins to atone for.

37. When Ahmed complained about this incident to Fine and Starr, no investigation was undertaken, there was no counseling of Gabby and his complaint was summarily dismissed on the spot.

**Fun Rescinds its PTO Policy because of Ahmed's Hajj**

38. Ahmed had been studying and preparing for his upcoming Hajj, which would be the first time for him, his mother and his brother. On May 22, 2024, though his leave had been approved since before he began work at Fun, Fine told Ahmed that as of that date they were abandoning the PTO Policy, had created a new policy, and that now his trip would not be fully covered as PTO by the new policy.

39. Ahmed complained to the co-founders that they were treating him differently and had changed the policy only because of him. After Ahmed insinuated that he might quit and left the office, the paid leave was reinstated but Fun prohibited any future vacation for Ahmed for the rest of the year.

40. Ahmed began his pious spiritual journey in Egypt, a short distance from his final destination in Saudi Arabia. Upon reviewing his plane tickets, he realized that he had booked a return date to the U.S. for Friday, July 12 not Wednesday, July 9.

41. On June 8, 2024, a month before he was due back, Ahmed informed Fun of his mistake and clarified that he would return from PTO three days later than expected, on Friday rather than Wednesday.

42. Gabby responded to Ahmed with frustration and incorrectly stated that Fun did not expect him to be away during the week of July 7, though she herself had entered the dates in the shared calendar; Gabby directed Ahmed to be available to work remotely during that week, though he had already secured some of that time off.

43. Back in Saudi Arabia, Ahmed was part of a chaotic rush of millions who were experiencing Hajj under extreme heat and weather conditions in which over 1300 people died; one person in his camp had a heat stroke and seizure. Spiritually, Ahmed was supposed to avoid the distractions of the worldly things and focus his entire mind on worship.

44. Yet during the midst of his spiritual quest, Ahmed was asked to complete deliverables and communicate with Fun about ongoing work. Despite issues with Wi-Fi, he did his best to cooperate and uploaded work to GitHub and update the team on progress via Google checklist document, including multiple features of the rearchitecture project to modularize the funkit product.

**<u>Gabby Posts Political Statements on the Work Communications Channel</u>**

45. On June 26, 2024, while working remotely from his Hajj, Ahmed noticed that on the Fun Slack channel, Gabby had posted an Israeli flag emoji next to her name. Ahmed reported this statement to Fine as yet another violation of the "no politics" policy.

46. Rather than investigating its meaning, Fine insisted that posting the Israeli flag in July of 2024 was not a political statement, since Gabby was in Israel at the time.

47. Ahmed explained to Fine how posting a flag during the current conflict was a political message. Ahmed understood the posting of the Israeli flag to be in violation of the "no politics" policy and it was upsetting to him. Fun prohibited Plaintiff from political expression but allowed another employee to display political expression favorable toward Israel.

48. Fine took no action and Gabby's Israeli flag remained on the Slack channel, even upon her return from Israel.

**Ahmed Again Reports Discrimination and is Terminated by Fun**

49. Though he was expected back in New York the next day, Fine sent Ahmed a message on July 11 asking about his work for the preceding week of July 7. Ahmed responded by reminding Fine he took the PTO with approval from day one of his employment, that his only mistake was confusing his return date of July 9 with July 12, not the entire week of July 7. He also explained that he had in fact completed quite a lot of work while on PTO, directed him to where it could be found, and explained that his bad Wi-Fi connection had not enabled him to communicate more.

50. On July 15, 2024, Fine and Starr met with Ahmed and presented him with a newly created "Best Intentions" policy. Fine and Starr told Plaintiff that he was required to accept the policy and withdraw his complaints concerning discrimination and harassment. They further communicated that if Plaintiff refused to do so, his employment would be terminated. Plaintiff refused to withdraw his complaints because he believed they concerned discrimination based upon his Arab ancestry and Muslim religion. Fine and Starr then terminated Plaintiff's employment.

51. Ahmed explained again in great detail his complaints of differential treatment as a Muslim, Arab man and how Fun's practices and made-up policies were incompatible with having the best intentions. Ahmed described his observation that Fun was tolerant of political expression by everyone, but especially Gabby, as compared to Ahmed, a Muslim, Arab; he recounted how Fine and Starr made exceptions and excuses for their failure to enforce the "no politics" policy, including concluding without investigation, that there was no "malintent" in anyone else's political expression. Among other arguments, Fine insisted that Gabby's conduct could not be harassment because his partner, who is Tunisian and Muslim, had talked to her many times about Israel. Ahmed objected to the requirement that he rescind his protected activity and refused the "best intentions" policy.

52. At the end of the meeting, Fine and Starr told Ahmed that he was terminated for refusing to accept that the differential treatment was motivated by "best intentions" and not bias, but that he could reconsider whether he would withdraw his complaints in conformity with the "best intentions" policy. They confiscated Ahmed's laptop and signed him out of all Fun accounts.

53. As Ahmed was leaving, Fine and Starr caught Ahmed outside the office and told Ahmed that they did not want to make any fast decisions on termination. They told Ahmed to take a week to reconsider the best intention policy.

54. Ahmed was highly distressed by the disruption during his holy journey as well as the differential treatment he had endured while employed by Fun. He sought out mental health treatment, was prescribed medications for anxiety, depression and sleep disruption. In addition, he experienced physical symptoms of his emotional distress.

55. On July 22, 2024 Ahmed wrote to Fun and again refused to withdraw his claims of sexual harassment, harassment and discrimination based upon his race and religion, and retaliation. He reiterated that Fun had not taken seriously his complaints of differential application and enforcement of its policies and had denied him a harassment-free workplace.

56. On July 24, 2024, General Counsel for Fun, Josh Downer ("Downer"), sent Ahmed a termination letter dated July 15, 2024. He also sent an email discussing the reason for termination which indicated that Ahmed was fired for taking an "unprofessional" leave for his Hajj and for not working and communicating enough during the final week of the leave. He did not mention anything about the best intentions policy shifting the reason for termination.

57. Downer also reported in the letter that after Ahmed was terminated, he conducted an investigation and concluded that Fun "never once made an issue of your religion or political views."

## CLAIMS

### FIRST CAUSE OF ACTION
**Discrimination Based upon Race in Violation of 42 U.S.C. § 1981**

58. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

59. Plaintiff was subjected to a hostile work environment and discriminated against in the terms and conditions of his employment because of his race, and ethnicity.

60. As a direct and proximate result of Defendant's discrimination, he has suffered and continues to suffer severe mental anguish and emotional distress.

### SECOND CAUSE OF ACTION
**Discrimination Based upon Race, Religion and Sex in Violation of the New York State Human Rights Law, NY Exec L § 296 et seq.**

61. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

62. Plaintiff was subjected to a hostile work environment and discriminated against in the terms and conditions of his employment because of his race, religion and sex.

63. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

THIRD CAUSE OF ACTION

**Discrimination Based upon Race, Religion and Sex in Violation of the New York City Human Rights Law, Administrative Code §8-107 et seq.**

64. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

65. Plaintiff was subjected to a hostile work environment and discriminated against in the terms and conditions of his employment because of his race, religion and sex.

66. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

FOURTH CAUSE OF ACTION

**Failure to Accommodate Religious Practice in Violation of NY Exec. Law § 296(10) and NYCHRL Admin. Code § 8-107(3)**

67. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

68. Plaintiff holds sincere religious beliefs as a devout Muslim, including an obligation under Qur'an 4:135 to bear witness for justice, and a religious prohibition on physical contact with women outside his marriage.

69. Plaintiff gave Defendants express, repeated notice of these religious practices and beliefs, including when he objected to removing his LinkedIn posts, and when he informed Fine, Starr, Gabby, and other employees on multiple occasions of his prohibition on physical contact with women.

70. Defendants failed to engage in a good-faith interactive process to reasonably accommodate Plaintiff's religious practices and instead required Plaintiff to violate them as a condition of continued employment, and further permitted a subordinate employee to physically violate that practice without investigation, discipline, or consequence.

71. As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

FIFTH CAUSE OF ACTION

**Retaliation in Violation of 42 U.S.C. § 1981**

72. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

73. Plaintiff complained to Defendants that he was being treated differently because of his Arab ancestry and race and objected to the disparate application of workplace policies. Defendants knew of Plaintiff's complaints. On July 15, 2024, Defendants demanded that Plaintiff withdraw his discrimination complaints as a condition of continued employment. Plaintiff refused, and Defendants terminated his employment.

74. As a direct and proximate result of Defendant's retaliation, he has suffered and continues to suffer severe mental anguish and emotional distress.

SIXTH CAUSE OF ACTION

**Retaliation in Violation of New York State Human Rights Law, NY Exec L § 296 et seq.**

75. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

76. Plaintiff complained to Defendants that he was being treated differently because of his religion, Arab ancestry and race and objected to the disparate application of workplace policies. Defendants knew of Plaintiff's complaints. On July 15, 2024, Defendants demanded that Plaintiff withdraw his discrimination complaints as a condition of continued employment. Plaintiff refused, and Defendants terminated his employment.

77. As a direct and proximate result of Defendant's retaliation, he has suffered and continues to suffer severe mental anguish and emotional distress.

SEVENTH CAUSE OF ACTION

**Retaliation in Violation of New York City Human Rights Law, Administrative Code of the City of New York §8-107 et seq.**

78. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

79. Plaintiff complained to Defendants that he was being treated differently because of his religion, Arab ancestry and race and objected to the disparate application of workplace policies. Defendants knew of Plaintiff's complaints. On July 15, 2024, Defendants demanded that Plaintiff withdraw his discrimination complaints as a condition of continued employment. Plaintiff refused, and Defendants terminated his employment.

80. As a direct and proximate result of Defendant's retaliation, he has suffered and continues to suffer severe mental anguish and emotional distress.

EIGHTH CAUSE OF ACTION

**Interference/Coercion in Violation of New York City Human Rights Law, Administrative Code of the City of New York § 8-107(19)**

81. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

82. NYCHRL § 8-107(19) makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right granted or protected under the NYCHRL.

83. On July 15, 2024, Defendants presented Plaintiff with a newly created "Best Intentions" policy and explicitly conditioned Plaintiff's continued employment on his withdrawal of his complaints of discrimination and harassment.

84. Defendants told Plaintiff that if he refused to withdraw his complaints, his employment would be terminated, and subsequently terminated his employment when he refused to do so.

85. This conduct constituted direct coercion and intimidation intended to interfere with Plaintiff's exercise of rights protected under the NYCHRL, independent of and in addition to Defendants' retaliatory termination of Plaintiff.

86. As a direct and proximate result of this coercion and interference, Plaintiff has suffered and continues to suffer damages including severe mental anguish and emotional distress.

## NINTH CAUSE OF ACTION
### **Battery**

87. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth herein.

88. Plaintiff had repeatedly and clearly informed Gabby, prior to the incident described herein, that his religion prohibited him from physical contact with women.

89. Despite this notice, Gabby intentionally initiated physical contact with Plaintiff by grabbing ice from his hands and wiping her bare hands on his, knowing this contact was unwanted and offensive to him.

90. Plaintiff did not consent to this physical contact, and the contact was harmful and offensive to a reasonable person in Plaintiff's position, particularly given his previously communicated religious boundaries.

91. Gabby's conduct was intentional, willful, and undertaken with knowledge that it would violate Plaintiff's religious beliefs and bodily autonomy, as evidenced by her demeanor during the incident and her failure to apologize or express any remorse at any time thereafter.

92. Defendants are liable for Gabby's conduct under the doctrine of respondeat superior, as the conduct occurred within the scope of her employment and on Defendants' premises, and/or Defendants are independently liable for failing to investigate or discipline Gabby after Plaintiff reported the incident.

93. As a direct and proximate result of this battery, Plaintiff suffered and continues to suffer physical, emotional, and psychological harm, including severe mental anguish and emotional distress.

94. Gabby's conduct, and Defendants' subsequent ratification of it through inaction, was undertaken with malice, willfulness, or reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

## PRAYER FOR RELIEF

While reserving the right to seek additional damages and plead additional causes of action as available, Plaintiff demands judgment against Defendants as follows:

A. Injunctive relief and a declaratory judgment in favor of Plaintiff against Defendants, declaring that Defendants have violated the law by harassing, discriminating against and retaliating against Plaintiff;

B. On all applicable causes of action, back pay and benefits and front pay and benefits, plus compensatory damages;

C. On all applicable causes of action, an award of punitive damages in an amount to be determined at trial;

D. All costs and disbursements of this action, including reasonable attorneys' fees; and

E. Any other further relief the Court may deem just and proper.

Sallem Ahmed

SALLEM AHMED

Dated: New York, NY
August 17, 2026

This complaint was prepared with the assistance of legal counsel.